UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

**MARIA DEL CARMEN MONTEFU ACOSTA**,

       Plaintiff,

v.

**MIAMI DADE COUNTY, et al,**

       Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court upon Defendants' Motion for Summary Judgment [ECF No. 70]. The Court has reviewed the full record associated with the Motion, including Defendants' Statement of Material Facts [ECF No. 71], Plaintiff's Statement of Material Facts [ECF No. 76], Plaintiff's Response in Opposition to Summary Judgment [ECF No. 78], and Defendants' Reply in Support of their Motion [ECF No. 88]. *See infra* p. 2 n.3 (setting forth full summary judgment record). For the reasons set forth herein, Defendants' Motion for Summary Judgment is **GRANTED**.

### FACTUAL BACKGROUND

This case arises from a February 27, 2014, incident between Plaintiff's son, Maykel Barrera ("Barrera"), and several Miami-Dade Police Department officers that ended in Barrera's death.[1] Plaintiff is the personal representative of her son's estate [ECF No. 114-1; ECF No. 121, pp. 7–

---

[1] The procedural history of this case is set forth at pages 13 through 15 of this Order, including the nearly-four year stay of this case pending a state investigation into the incident and the transfer to this Court on June 2, 2021 [ECF No. 83].

8 (Report and Recommendation discussing July 2021 petition for administration filed by Plaintiff)].[2]

The following facts are drawn from Plaintiff's Statement of Material Facts [ECF No. 76], Defendants' Statement of Undisputed Material Facts [ECF No. 71], as well as all record evidence submitted by the parties.[3] The summary judgment record includes testimony from the seven Miami-Dade Police Department Officers who were on scene for the incident (Officers Ballesteros,

---

[2] On July 16, 2021, Plaintiff initiated proceedings in the Probate Division of the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County Florida by filing a Petition for Administration [ECF No. 144-1]. The Court takes judicial notice that the Probate Court since has entered an order appointing Plaintiff as personal representative of her son's estate. Fed. R. Evid. 201(c)(1); *see* Case No. 2021-003517-CP-02 (Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida) ([D.E.20], Oct. 8, 2021).

[3] The full summary judgment record contains the following: Defendants' Statement of Material Facts [ECF No. 71]; Deposition Transcript of Plaintiff, Maria Del Carmen Montefu Acosta [ECF No. 71-2]; Deposition Transcript of Damaisy Rodriguez [ECF No. 71-3]; Transcript of 911 Call, Track 2 [ECF No. 71-4]; Deposition Transcript of Venus Barrera [ECF No. 71-5]; Plaintiff's Sworn Statement of February 28, 2014 [ECF No. 71-6]; Photo of Plaintiff with ripped shirt [ECF No. 71-7]; Transcript of 911 Call, Track 3 [ECF No. 71-8]; Transcript of 911 Call, Track 4 [ECF No. 71-9]; Deposition Transcript of Officer Lawrence Ballesteros [ECF No. 71-10]; Transcript of 911 Call, Track 5 [ECF No. 71-11]; Miami-Dade Police Department Incident Recall Report [ECF No. 71-12]; Deposition Transcript of Officer Cynthia Mead [ECF No. 71-13]; Deposition Transcript of Officer Jorge Ferrer [ECF No. 71-14]; Miami-Dade Police Department Units On Scene Report [ECF No. 71-15]; Deposition Transcript of Officer Miguel Maldonado [ECF No. 71-16]; Deposition Transcript of Officer Luis Gomez [ECF No. 71-17]; Deposition Transcript of Witness Demetrius McKenzie [ECF No. 71-18]; Deposition Transcript of Officer Giovanni Rodriguez [ECF No. 71-19]; Deposition Transcript of Officer Enrique Noriega [ECF No. 71-20]; Miami-Dade Fire Rescue Report [ECF No. 71-21]; Expert Witness Report of Dr. Gary Vilke [ECF No. 71-22]; Miami-Dade Medical Examiner's Report [ECF No. 71-23]; Report of Miami-Dade Chief Medical Examiner Dr. Emma Lew [ECF No. 71-24]; Deposition Transcript of Witness Gwendolyn Flowers [ECF No. 71-25]; Certified Conviction Records for Maykel Barrera [ECF No. 71-26]; Deposition Transcript of Expert Witness Teri Stockham [ECF No. 71-27]; Declaration of Jennifer Cates, Family Court Division Director of Miami-Dade Clerk's Office [ECF No. 71-28]; Plaintiff's Statement of Material Facts [ECF No. 76]; Maykel Barrera's Medical Records [ECF No. 76-1]; Plaintiff's Response in Opposition [ECF No. 78]; Defendants' Reply in Support of their Motion [ECF No. 88]; and Plaintiff's Petition of Administration, Oath of Personal Representative, and Waiver of Priority filed in Miami-Dade Probate Court [ECF No. 114-1].

2

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

Mead, Ferrer, Maldonado, Gomez, and Noriega); Barrera's mother, Maria Del Carmen Montefu Acosta ("Plaintiff"), and Barrera's girlfriend, Damaisy Rodriguez ("Damaisy"), both of whom witnessed Barrera's behavior leading up to the arrival of the Officers; and two eyewitness accounts of the incident from Barrera's neighbors, Gwendolyn Cook Flowers and Demetrious McKenzie.

The Court has considered the entire summary judgment record and construes it in a light most favorable to Plaintiff. On this point, the Court notes as follows: Plaintiff did not file a response to Defendants' Statement of Undisputed Material Facts [ECF No. 71]. Plaintiff did file her own Statement of Undisputed Material Facts, but she did not indicate in that Statement which facts were disputed or undisputed based on Defendants' Statement [ECF No. 71]. Instead, Plaintiff's Statement relies on Defendants' exhibits [ECF No. 76, p. 1] and sets forth a factual narrative using certain portions of the officers' deposition testimonies, and then in two instances attempts to discredit one officer's testimony in a generalized manner [ECF No. 76; *see* ECF No. 76 ¶¶ 63–65; *see also* ECF No. 76 ¶¶ 119–122 (referencing hospital records without pinpoint citations)]. Given the nature of Plaintiff's filing, Defendants ask this Court to deem Defendants' Statement of Undisputed Material Facts admitted for purposes of this Motion, noting that Plaintiff's Statement does not comply with Local Rule 56.1 for both procedural and substantive reasons [ECF No. 88, p. 2]. Although Defendants are correct that Plaintiff's filing does not properly identify any factual disputes with Defendants' Statement, this Court will not grant Defendants' full request on this point. This Court considers the entire factual record pertinent to summary judgment, relying on Defendants' Statement to the extent Plaintiff fails to dispute it with record evidence or to offer contrary evidence.

### A.  Barrera's Pre-Arrest Behavior

On February 27, 2014, at 4:00 p.m., Barrera entered his apartment in Miami, Florida, where he lived with his girlfriend, Damaisy [ECF No. 71 ¶ 3].  Damaisy noticed that Barrera was acting "paranoid," "restless," and had "very pale" skin [ECF No. 71-3, pp. 65:18–20, 66:1–16].  Barrera left his apartment an hour later at 5:00 p.m. without telling Damaisy where he was going [ECF No. 71 ¶ 4; ECF No. 76 ¶ 1].  Between 7:00 p.m. and 8:00 p.m., Damaisy drove around Miami with Plaintiff to find Barrera, eventually locating him at a gas station where he was driving Damaisy's car in and out of the parking lot [ECF No. 71 ¶¶ 5–6; ECF No. 71-3, p. 67:3–25; ECF No. 76 ¶ 3].

At 8:10 p.m., while driving in her car, Plaintiff called 911 and told the dispatcher, "I am the mother of a young man who took his wife's car away from her because he is high on drugs . . . [a]nd he's paranoid, he says he's paranoid because it looks like he used crack" [ECF No. 71 ¶ 7; ECF No. 71-4, p. 2; ECF No. 76 ¶ 4].  Barrera left the gas station before the police arrived and eventually returned to his apartment at 10:00 p.m. [ECF No. 71 ¶¶ 11, 12–14].

Back at Barrera's apartment, while Plaintiff, Damaisy, and Barrera were sitting in the living room, Plaintiff hid Damaisy's car keys underneath herself on the sofa so Barrera would not be able to drive away again [ECF No. 71 ¶ 14; ECF No. 71-3, p. 80:9–20; ECF No. 76 ¶ 4].  When Barrera realized that Plaintiff had hidden the car keys, he became upset and demanded that Plaintiff give the keys to him [ECF No. 71 ¶¶ 14–15; ECF No. 1-2, p. 120:9–23; ECF No. 71-3, pp. 81:1–8, 82:2–6].  Barrera grabbed Plaintiff, picking her up off the sofa, causing her shirt to tear, and then dropped her back down [ECF No. 71 ¶ 16; ECF No. 71-2, pp. 120:24–121:16; ECF No. 71-7].  He later asked Plaintiff for forgiveness [ECF No. 76 ¶ 11; ECF No. 71-3, p. 82:18–19].  Barrera told Plaintiff to "[c]all someone to help me because I've done drugs" [ECF No. 71-2, p. 121:19–22].

When Barrera left the room, Plaintiff told Damaisy to "Run.  Call the police" [ECF No. 71-3, pp. 84:25–85:4, 86:5–10; ECF No. 71-6, p. 11; ECF No. 76 ¶ 12].  At 10:57 p.m., Damaisy called 911 and could be heard on the 911 call yelling "[h]urry up, please," and "[r]elax! . . . [D]on't . . . Michael [sic]! . . . Get off me! [Screaming]" [ECF No. 71 ¶¶ 18–19; ECF No. 71-8, p. 2 (transcript of 911 call); ECF No. 71-9, p. 2 (transcript of 911 call)].  Plaintiff testified that during Damaisy's call to 911, Barrera took the phone out of Damaisy's hands and threw it on the sofa before the dispatcher could obtain any further information [ECF No. 71 ¶¶ 20–21; ECF No. 71-2, p. 121:14–17].

**B.  The Defendant Officers' Arrest of Barrera**

At 11:00 p.m., following Damaisy's calls to 911, three Miami-Dade Police Department officers—Officers Ballesteros, Mead, and Ferrer—were dispatched in emergency mode regarding a "violent dispute on an open line" [ECF No. 71 ¶ 22; ECF No. 71-11, p. 2:2–6; ECF No. 71-12].  The three officers arrived at Barrera's apartment at 11:03 p.m. and 11:04 p.m. [ECF No. 71 ¶ 23].  Officer Ballesteros noticed that two cars were parked "strangely" outside of the parking lines of the apartment [ECF No. 71-13, p. 36:8–9].  Officer Mead noticed a man looking out the window opening and closing the curtains with a "wild look about hi[m]" [ECF No. 71 ¶¶ 24–26].

The officers approached the door to Barrera's apartment, knocked several times, and Officer Ballesteros announced the group as the "Miami-Dade Police Department" [ECF No. 71-10, p. 59:1–11].  Officer Ferrer testified that he could hear voices inside that sounded like those of females in distress [ECF No. 71 ¶¶ 28–29; ECF No. 71-14, p. 27:3–12].

Meanwhile, while the officers remained outside, Plaintiff told Barrera to open the door, which Barrera did, and upon seeing the Officers, Barrera began cursing at the Officers and attempted to close the door [ECF No. 71 ¶¶ 30, 32; ECF No. 76 ¶ 14].  Officer Ballesteros testified

5

that he saw two women and two children inside the apartment with "fear on their face[s]" [ECF No. 71 ¶ 31; ECF No. 71-10].

Barrera slammed the door on Officer Ferrer who had positioned himself in the doorway, striking Officer Ferrer several times, but Officer Ferrer was able to push open the door to enter the apartment [ECF No. 71 ¶¶ 33–35; ECF No. 76 ¶ 39].  Barrera ran through the apartment and outside the back door despite commands to stop [ECF No. 76 ¶ 15].  Officers Ferrer, Mead, and Ballesteros ran after Barrera through the apartment [ECF No. 71-2 p. 135:18–23].  While still inside the apartment, Officer Ferrer attempted to use a taser to detain Barrera, but the taser probes did not make contact with Barrera [ECF No. 71 ¶¶ 36–38].  Barrera kept running, exited the apartment, and made his way onto the street in the area of S.W. 200th Street and 120th Avenue [ECF No. 71 ¶ 39].

Officer Ferrer called for backup while Officer Mead pursued Barrera in a police car and eventually caught up to Barrera [ECF No. 71 ¶ 41].  Officer Mead got out of her police car, saw Barrera running along the sidewalk, ordered Barrera to stop, but Barrera continued running—so Officer Mead deployed her taser on Barrera [ECF No. 71-13 p. 58:14–25].  Officer Mead testified that the taser had no effect on Barrera, however, because Barrera "was able to shake off a taser like it was nothing," looked at Officer Mead, and appeared "possessed" and "crazy" [ECF No. 71 ¶¶ 40–43; ECF No. 71-13 p. 58:18–25].  Officers Ballesteros and Mead both ran on foot and caught up to Barrera at the intersection of S.W. 204th Street and S.W. 122nd Avenue [ECF No. 71 ¶ 46].  Officer Ferrer arrived soon afterward [ECF No. 71 ¶ 46].

Officers Ballesteros and Mead then separately deployed their tasers to try to subdue Barrera, but Barrera continued to resist the officers' attempts to take him into custody [ECF No. 71 ¶¶ 47–48].  Officers Mead and Ferrer both called for backup, requesting a "3-15,"

meaning that an officer needs emergency backup, the highest level of priority [ECF No. 71 ¶ 47].
Officer Gomez arrived as an emergency backup and attempted to contain and handcuff Barrera
with Officer Ballesteros but was unable to subdue him [ECF No. 71 ¶¶ 50–51; ECF No. 71-17,
p. 28:16–21 & p. 30:21–25 (Officer Gomez testifying that Barrera was "enraged," "very
combative," and "pushing everyone around, especially Officer Ballesteros"; that he (Officer
Gomez) tried to assist the officers in subduing Barrera; but that when he tried to grab Barrera he
felt a "push" and then lost memory of the incident after being stricken in the struggle)].

Officers Maldonado, Rodriguez, and Noriega arrived on the scene as backup during the
struggle [ECF No. 71 ¶ 62].  They saw a police officer lying motionless on the ground bleeding
from his head [ECF No. 71 ¶ 63].  Officer Maldonado also testified that he saw Barrera "attempting
to choke out [Officer] Ballesteros" while on top of Officer Ballesteros [ECF No. 71 ¶¶ 63–64;
ECF No. 71-16, p. 84:13–15].  Officer Rodriguez testified that, during his attempts to handcuff
Barrera, he struck Barrera with a couple "distractionary" strikes in his rib area (using his fists)
[ECF No. 71-19, p. 58:1–18; ECF No. 71 ¶ 68].  Similarly, Officer Noriega testified that he struck
Barrera once on his right shoulder with his knee to try take Barrera into custody, but Barrera "was
still latched on to [Ballesteros's] waist" [ECF No. 71 ¶ 69; ECF No. 76 ¶ 53; ECF No. 71-20,
p. 23:3–23 (Officer Noriega describing that he did not know if Barrera was trying to grab an
officer's gun during struggle)].

Officer Ballesteros testified that he was able to grip one of Barrera's arms while the other
officers restrained Barrera, and that Barrera told Officer Ballesteros that he was breaking his arm
[ECF No. 76 ¶ 57; ECF No. 71-10, p. 167:2–4].  Officer Maldonado testified that he deployed his
taser twice on Barrera's upper torso, but it still had no effect until he deployed the taser a third

time to Barrera's shoulder area, and only then, with the help of the other officers, was Officer Maldonado able to finally restrain Barrera [ECF No. 71 ¶¶ 70–72; ECF No. 76 ¶ 52].

At 11:17 p.m., the Officers handcuffed Barrera and carried him away from the sidewalk to a nearby grassy area [ECF No. 71 ¶ 80].  While handcuffed, Barrera continued to scream, kick, spit, growl, thrash at the Officers and attempted to bite Officer Maldonado [ECF No. 71 ¶ 74]. Fourteen minutes had elapsed from the time the Officers arrived at Barrera's apartment at 11:03 p.m. until he was restrained at 11:17 p.m. [ECF No. 71 ¶¶ 23, 80].  In total, it took seven officers to restrain and arrest Barrera [ECF No. 71 ¶ 76].

**C.  Bystander Testimony of the Arrest**

**1.  Demetrius McKenzie**

Demetrius McKenzie, a neighbor, witnessed the struggle between Barrera and the officers from the vantage point of "[r]ight down the street from [her] house" [ECF No. 71-18, p. 6:20–23]. McKenzie stated that she witnessed "a guy running" with "[t]wo cops running after him" calling for backup [ECF No. 71-18, p. 22:6–8].  McKenzie stated that the officers eventually "caught [Barrera] there on the sidewalk," but "[t]hey could not get him down.  They could not get him down" [ECF No. 71-18, pp. 15:23–25, 22:8 (alterations added)].  McKenzie observed five to six officers trying to put handcuffs on Barrera, but they were unable to do so because "[Barrera] was like fighting them off him. So they couldn't put the cuffs on him right away" [ECF No. 71-18, p. 12:1–7 (alteration added)].

McKenzie testified that the officers "put their arms around [Barrera's] neck" and "were trying to put his arm around it and he knocked that one off, like get off me" [ECF No. 71-18, p. 15:13–16].  McKenzie stated that Barrera was not "punching" the Officers, but instead described Barrera's behavior as "like fighting with his elbows" and "fighting so he won't get the cuffs on

him" [ECF No. 71-18, pp. 12:15, 15:2–3].  McKenzie stated that the officers could not restrain

Barrera because "he was a big guy" [ECF No. 71-18, p. 26:5–7].

McKenzie testified that Barrera struck at least two officers with his elbows, but later

characterized the strikes as a "hard push with his elbow and [the officers] fell" [ECF No. 71-18,

pp. 15:4–6, 21:1–5, 61:21–22, 70:11–15 (alteration added)].  McKenzie stated that after Barrera

hit a second officer, she witnessed one officer put Barrera's neck in a "yoke" and "one had a knee

in his chest" [ECF No. 71-18, p. 16:4–6].  At this point, McKenzie witnessed the officers pull out

their tasers and use them on Barrera, stating that the officers were "Tasing, Tasing" Barrera; that

they "not able to control him"; that "they really couldn't handle him because he was a big guy";

that "the [o]nly way they got him on the ground [was] when they [were] Tasing him"; and that

"[o]ne officer was choking him" [ECF No. 71-18, p. 18:1–9 (alterations added)].

McKenzie stated that "once they got [Barrera] on the ground, he was calm.  He was okay"

[ECF No. 71-18, p. 26:16–17].  McKenzie testified that "[a]ll they had to do was put the cuffs and

stand him up" once Barrera was on the ground but saw officers "jump[] out [of their] car, about

six of them, and they was Tasing the man" [ECF No. 71-18, p. 26:13–20 (alterations added)].

McKenzie stated that the tasers were "how they got the best of [Barrera]" [ECF No. 71-18, p. 28:3–

5].

McKenzie stated that, after the officers deployed their tasers, "they handcuffed [Barrera]

after they seen he wasn't moving no more.  That's when they put the handcuffs on him" [ECF No.

71-18, pp. 15:2–6; 18:10–18 (alteration added); *see* ECF No. 71-18, p. 18:15–25 & p. 19:1–11

(McKenzie testifying that Barrera looked like "dead weight" after being handcuffed)].  McKenzie

did not testify that officers tasered Barrera while Barrera was handcuffed.

### 2.  Gwendolyn Flowers

Another neighbor and witness to the incident, Gwendolyn Flowers, testified that she noticed police officers chasing after an individual, so she walked from her house to get a better view, eventually coming as close as "about two and a half car lengths" away from where Barrera and the officers were on the sidewalk [ECF No. 71-25, p. 57:1–10].  Flowers testified that she saw the officers use their tasers on Barrera, and "when they tased him, he fell, and when he fell—he was in the road then" [ECF No. 71-25, p. 10:7–11].

Flowers stated that after Barrera fell, the officers "started to kick him" [ECF No. 71-25, p. 48:1–3].  Flowers could not recall how many officers kicked Barrera or how many times Barrera was kicked, stating "I really don't know.  I don't know whether or not—how many times they kicked that man" [ECF No. 71-25, p. 51:2–5].  Flowers did not know whether Barrera was handcuffed at that point [ECF No. 71-25, p. 57:11–17].  Flowers also was not sure whether the officers used their tasers on Barrera once he was on the ground, stating, "I don't know. I can't answer that.  I don't know" [ECF No. 71-25, p. 54:1–5].  After Barrera was tasered, Flowers described Barrera as "just laying there" on the ground," at which point two officers picked him up and "put him in the police car" [ECF No. 71-25, p. 54:16–19].

### D.  Medical Evidence of Barrera's Cause of Death

At 11:25 p.m., Miami-Dade County EMS paramedics arrived on scene and observed police "struggling to get [Barrera] in [the] back of their squad car" [ECF No. 71 ¶ 78].  The paramedics assessed Barrera and took his vital signs at 11:30 and 11:34 p.m. [ECF No. 71 ¶ 79].  At 11:36 p.m., Barrera went into respiratory arrest and had no pulse [ECF No. 71 ¶ 80].  He was taken to Jackson Memorial Hospital where he died the following morning [ECF No. 76 ¶ 118].  Prior to Barrera's death, Dr. Edward Lineen, Barrera's attending physician, reported that a decision was made to not

resuscitate Barrera because the doctors felt that he was "nonsurvival with too many severe injuries and a[n] anoxic injury" [ECF No. 76 ¶ 118 (alteration added)].

The Associate Medical Examiner, Dr. Mark Shuman, conducted an autopsy in March 2014 and certified Barrera's cause of death as "cocaine and alpha-Pyrrolidinopentiophenone Toxicity" and the "manner of death" as an "accident" [ECF No. 71-23]. These findings are detailed in a two-page report entitled Classification of Pending Case dated September 2014, which lists the results of toxicology testing on Barrera as well as various injuries on Barrera's body, including multiple abrasions, contusions of his head, neck, torso, and extremities, hemorrhages, and puncture wounds in the chest area consistent with a taser probe [ECF No. 71-23, pp. 4–5].

The Chief Medical Examiner, Dr. Emma Lew, then issued a Consultation Report in March 2021 concurring with the Medical Examiner that Barrera's cause of death was "cocaine and alpha-pyrrolidinopentiophenone toxicity" [ECF No. 71-24, p. 4]. The Consultation Report also makes the following findings: (1) that Barrera did not die from a beating or as a result of being tasered [ECF No. 71-24, p. 3]; (2) that Barrera sustained injuries consistent with blunt trauma, including scrapes, bruises, lacerations, hemorrhages on both sides of his head (not associated with skull fractures or bleeding inside the skull or brain), subcutaneous hemorrhages in the chest/abdomen/back/neck area, subcutaneous hemorrhage around the knees and thighs hematoma and other head injuries, and puncture wounds on the chest/abdomen/back area compatible with taser marks [ECF No. 71-24 pp. 1–3]; (3) that Barrera did not sustain injuries consistent with a death caused by a beating, including, for example, black eyes, facial/skull fractures, cerebral cortical contusions, fractured ribs, or ruptured organs [ECF No. 71-24 p. 3]; (4) that "the Taser impulses did not cause his death," because Barrera survived for hours after the tasers had been administered, whereas death associated with being tasered usually occurs within seconds due to

ventricular fibrillation and other cardiac dysrhythmias [ECF No. 71-24 p. 3]; and (5) that Barrera's "[c]ocaine and alpha-PVP toxicity explains the bizarre, paranoid, aggressive and combative behavior that Mr. Barrera displayed prior to and during his interaction with responding police officers" [ECF No. 71-24, p. 3].

Defendants' expert witness, Dr. Gary M. Vilke, a board-certified emergency department physician and an independent researcher on the effect of tasers on human physiology, reviewed Barrera's entire medical record to render an opinion on Barrera's cause of death [ECF No. 71-22]. Dr. Vilke states in his expert witness report that, "Barrera's cardiac arrest and death were not caused by the restraint process or the use of the TASER ECD, but rather from his cocaine and flakka use in combination with an enlarged heart and continued physical resistance" [ECF No. 71-22, p. 1]. Dr. Vilke states that if Barrera had been "electrocuted" by a taser, "his heart would have gone into a VF [ventricular fibrillation] at the time the electricity was being delivered and he would have immediately lost consciousness at the time that the TASER ECD was discharging or within 1–2 seconds after stopping" [ECF No. 71-22, pp. 13–14 (alteration added)]. Dr. Vilke states that Barrera's continued struggle with the officers after being tasered supports that a taser did "not cause his heart to go into cardiac arrest" [ECF No. 71-22, p. 14].

Dr. Teri Stockham, Plaintiff's proffered toxicology expert, prepared a report regarding the toxicological aspects associated with this case [ECF No. 68-3]. She reviewed the entire medical file, including the records from the Miami-Dade Medical Examiner Department [ECF No. 86-3]. Dr. Stockham's report does not contain an opinion as to cause of death, but it questions the usefulness of the Medical Examiner's toxicology report to determine a cause of death and states that a cocaine and alpha-PVP overdose would not result in Barrera's injuries [ECF No. 68-3, p. 4]. During her deposition, Dr. Stockham testified that she "think[s] [Barrera] died from a beating,"

but she conceded that she is not qualified to offer an opinion on cause of death because "[toxicologists] do not offer opinions on cause or manner of death" [ECF No. 71-27, pp. 88:7–9, 10:1–17,11:19–12:12, 77:15–18].  Dr. Stockham testified that she defers to the Medical Examiner on opinions related to cause of death because "they are the ones that do cause of death" [ECF No. 71 ¶ 94; ECF No. 71-24, pp. 16:6–7, 24:11–16, 128:16–20].

## PROCEDURAL HISTORY

On February 26, 2016, Plaintiff filed a Complaint in the Circuit for of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida [ECF No. 1-2].  The Complaint asserted eleven causes of action against various defendants:

- Count 1 – 42 U.S.C. § 1983 claim against Luis Gomez;

- Count 2 – 42 U.S.C. § 1983 claim against Lawrence Ballesteros;

- Count 3 – 42 U.S.C. § 1983 claim against Jorge Ferrer;

- Count 4 – 42 U.S.C. § 1983 claim against Cynthia Mead;

- Count 5 – 42 U.S.C. § 1983 claim against Giovanni Rodriguez;

- Count 6 – 42 U.S.C. § 1983 claim against Enrique Noreiga;

- Count 7 – 42 U.S.C. § 1983 claim against Miguel Maldonado;

- Count 8 – 42 U.S.C. § 1983 claim against J.D. Patterson, Jr.;

- Count 9 – 42 U.S.C. § 1983 claim against the Miami-Dade Police Department and Miami-Dade County;

- Count 10 – a state law negligence claim against the Miami-Dade Police Department and Miami-Dade County;

- Count 11 – a claim against all Defendants pursuant to Florida's Wrongful Death Act, Fla. Stat. § 768.19.

[ECF No. 1-2 ¶¶ 33–108].

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

On July 28, 2016, Defendants timely removed the case to the Southern District of Florida after all the defendant officers were served [ECF No. 1].  On August 3, 2016, the parties filed a joint motion to stay proceedings while the State Attorney's Office reviewed the investigative file and the Miami-Dade Police Department Professional Compliance Bureau finalized its administrative investigation into the matter [ECF No. 5].  On August 11, 2016, Judge Ursula Ungaro, the previously assigned United States District Judge for this case, granted the joint motion and issued a complete stay pending the state investigations [ECF No. 7].

On February 2, 2018, the parties filed a joint status report indicating that the Miami-Dade Police Department Professional Compliance Bureau's investigation was complete [ECF No. 17]. On July 13, 2020, Plaintiff filed an unopposed motion requesting to reopen the case [ECF No. 18]. On July 16, 2020, Judge Ungaro granted Plaintiff's motion and lifted the stay [ECF No. 19].

On August 3, 2020, Defendants Miami-Dade County, Miami-Dade Police Department, J.D. Patterson, Jr., and Alfredo Ramirez III moved to dismiss Counts 8, 9, 10 and 11 of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("County Motion") [ECF No. 26]. That same day, Defendants Luis Gomez, Lawrence Ballesteros, Jorge Ferrer, Cynthia Mead, Giovanni Rodriguez, Enrique Noreiga, and Miguel Maldonado moved to dismiss Counts 1–7 and 11 of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Officers' Motion") [ECF No. 27].

On September 8, 2020, Judge Ungaro entered an Order granting the County's Motion, dismissing all claims against them (Counts 8, 9, 10, and 11), and granted in part and denied in part the Officers' Motion [ECF No. 37].  Plaintiff's federal excessive force claims against the Officers (Counts 1–7) and the state law wrongful death claim against the Officers (Count 11) survived the Motion to Dismiss [ECF No. 37].

14

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

On May 14, 2021, Defendants filed the instant Motion for Summary Judgment [ECF No. 70]. On May 28, 2021, Plaintiff filed a Response in Opposition [ECF No. 78], and Defendants thereafter filed a Reply [ECF No. 88]. The matter was transferred to this Court on June 2, 2021 [ECF No. 83]. On June 11, 2021, Plaintiff voluntarily dismissed her claim against Officer Gomez in Count 1 [ECF Nos. 75, 97]. The Motion is now ripe for adjudication.

**LEGAL STANDARD**

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

"For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal quotation marks omitted). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The moving party has the initial burden of showing

15

the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e).

## DISCUSSION

Defendants move for summary judgment on all remaining counts in the Complaint (Counts 1 through 7 and Count 11), making three primary arguments: (1) that Plaintiff does not having standing to bring a claim on behalf of her deceased son, Barrera, because she failed to initiate probate proceedings and is not the personal representative of his estate; (2) that Plaintiff has failed to establish causation to support her claim that a beating or the use of a taser caused Barrera's death; and (3) that despite the lack of Plaintiff's standing or failure to establish causation, the Officers are entitled to qualified immunity on the claims of excessive force [ECF No. 70, pp. 8–20].  The Court addresses each argument in turn.

### A. Plaintiff may pursue claims on behalf of Maykel Barrera

Defendants argue that "Plaintiff does not have standing to bring any claim on behalf of her deceased son, Barrera, because she is not the personal representative of his estate" [ECF No. 70, p. 8].  As relevant here, Florida's Wrongful Death Act, Fla. Stat. § 768.16 *et. seq.*, provides that an action for wrongful death "shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death."  Fla. Stat. § 768.20; *see Torres v.*

*Orange Cty., Fla.*, No. CIVA6991662CIVORL19B, 2000 WL 35527256, at *1 (M.D. Fla. May 16, 2000), supplemented, No. 6:99-CV-1662ORL22DAB, 2001 WL 35969129 (M.D. Fla. Jan. 15, 2001).

In support of their argument that Plaintiff lacks standing to bring a claim on behalf of Barrera, Defendants submitted a declaration from Jennifer Cates, the Director of the Miami-Dade Clerk of Courts' Family Courts Division, stating that, at the time Defendants' Motion for Summary Judgment was filed (May 14, 2021), no court record existed appointing Plaintiff as the personal representative of the Estate of Maykel Barrera [ECF No. 70, p. 9; *see* ECF No. 71-28 ¶¶ 4–5 (Declaration of Jennifer Cates)].  Defendants do not currently dispute that Plaintiff since has been appointed personal representative of her son's estate in state court.  *Supra* p. 2, n.2.

Plaintiff did not address Defendants' absence-of-statutory-standing argument in her Response in Opposition to Summary Judgment [ECF No. 78].  However, during an evidentiary hearing held on August 4, 2021 before Magistrate Judge Alicia M. Otazo-Reyes to address Defendant's Motions for Sanctions [ECF Nos. 80, 105], Plaintiff submitted her July 2021 Petition of Administration, Oath of Personal Representative, and Waiver of Priority filed in Miami-Dade Probate Court [ECF No. 114-1].  Also during the evidentiary hearing, Jennifer Cates testified that "once the judge signs an order appointing Plaintiff as the personal representative, Plaintiff will have all the rights to do what is necessary on behalf of Barrera's Estate" [ECF No. 121, p. 8].

As justification for her failure to file the required forms in state court when she initiated this action, Plaintiff asserts that (1) her prior attorneys assured her that the documents had been filed; (2) she only recently learned that she was not personal representative of her son's estate; and (3) this Court therefore should relate her post hoc designation as representative of her son's estate back to the filing of the original complaint [ECF No. 108, pp. 2, 10].

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

Florida courts have approved the substitution of a party-plaintiff in wrongful death cases when, through inadvertence, a plaintiff fails to open the administration of an estate but later cures the error. *See Lindor v. Fla. E. Coast Ry., LLC*, 255 So. 3d 490, 492 (Fla. Dist. Ct. App. 2018) (reversing trial court decision that struck a wrongful death complaint for failing to file a petition for administration of estate, and holding that a subsequent designation of a plaintiff as the proper personal representative of the estate relates back to the filing of the complaint); *Griffin v. Workman*, 73 So. 2d 844, 847 (Fla. 1954) (quoting *Douglas v. Daniels Bros. Coal Co.*, 135 Ohio St. 641, 648 (1939) ("'We hold that where a widow institutes an action as administratrix, for damages for the wrongful death of her husband, under the mistaken belief that she had been duly appointed and had qualified as such, thereafter discovers her error and amends her petition so as to show that she was appointed administratrix after the expiration of the statute of limitation applicable to such action, the amended petition will relate back to the date of the filing of the petition, and the action will be deemed commenced within the time limited by statute.'")).

In assessing whether to relate the new filing of an administration to the original complaint, the Court in *Est. of Eisen v. Philip Morris USA, Inc.*, 126 So. 3d 323 (Fla. Dist. Ct. App. 2013), identified four factors to consider:

> (1) Whether the timely-filed action gave the defendants fair notice of the legal claim and the underlying allegations; (2) Whether there is an identity of interest between the original and substituted plaintiff; (3) Whether the amendment caused any prejudice to the defendants; and (4) Whether the amendment to substitute plaintiffs would create a 'new' cause of action.

*Id*. at 330.

Applying the available Florida authorities on this issue and the applicable factors governing party substitution, this Court determines that Plaintiff may bring the instant suit for wrongful death. Fla. Stat. § 768.20.  There is a clear identity of interest between Plaintiff and Barrera, as Plaintiff

is now, and always has been, Barrera's mother.  The filing of this suit in February 2016 gave Defendants fair notice of the legal claim and the underlying allegations.  Substitution of Plaintiff in this manner cannot fairly be said to create a "new" cause of action.  And although Defendants certainly have had to litigate this lawsuit for years under the assumption that Plaintiff had acquired the proper legal status as representative, there is no current dispute that Plaintiff now has cured that deficiency in state court.  Accordingly, any litigation prejudice to Defendants is significantly outweighed by the countervailing considerations and does not warrant dismissal.

**B.  Plaintiff has failed to establish a genuine issue of fact as to causation to support her wrongful death claim (Count 11)**

Pursuant to Florida's Wrongful Death Act, Plaintiff alleges that, as a "direct and proximate result of the acts of the Defendants," Barrera suffered a wrongful death from injuries sustained from being beaten and tasered [ECF No. 1-2 ¶ 38, 106–108].  *See* Fla. Stat. § 768.19 ("When the death of a person is caused by the wrongful act, negligence, default, or breach of contract or warranty of any person . . . and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person . . . that would have been liable in damages if death had not ensued shall be liable for damages as specified in this act notwithstanding the death of the person injured, although death was caused under circumstances constituting a felony.").  Defendants respond that Plaintiff has failed to demonstrate that a material issue of fact exists on the issue of causation [ECF No. 70, p. 10–15].  Upon review of the full record, the Court agrees with Defendants that no genuine issue as to any material fact exists regarding Plaintiff's wrongful death claim, warranting summary judgment in favor of Defendants on Count 11.

Section 768.19 of Florida's Wrongful Death Act creates a cause of action for wrongful death when "the death of a person is caused by the wrongful conduct, negligence, default, or breach of contract or warranty of any person."  Fla. Stat. § 768.19.  The elements of a wrongful death

action are: (1) a legal duty owed to the decedent; (2) breach of that duty; (3) the legal or proximate cause of death was that breach; and (4) consequential damages. *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. Dist. Ct. App. 2003).

Under Florida law, the plaintiff bears the burden of proving causation. *See Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014). In Florida, "courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). In the Rule 56 context, where the nonmoving party bears the burden of proof at trial, like Plaintiff does here, the moving party has the burden of showing that there is an "absence of evidence to support the nonmoving party's case or by showing that the nonmoving party will be unable to prove its case at trial." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). "To survive summary judgment, the nonmoving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion." *Id.* (citing *Fitzpatrick v. Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993)).

Defendants assert that Plaintiff "offers no expert testimony" to establish the third element of a wrongful death claim—"a causal connection between the Officers' alleged misconduct and Barrera's death"—and that she therefore has failed to make a showing sufficient to establish the existence of an element essential of her case [ECF No. 70, p. 13]. In support of their causation argument, Defendants submit the following materials: (1) Barrera's autopsy report conducted by Dr. Shuman, Associate Medical Examiner at the Miami-Dade County Medical Examiner Department [ECF No. 71-23]; (2) the Consultation Report prepared by Dr. Emma Lew, the Chief Medical Examiner for the Miami-Dade County Medical Examiner Department [ECF No. 71-24];

and (3) an expert report by Dr. Gary Vilke, a board-certified emergency medicine physician and researcher on the effects of tasers on physiology [ECF No. 71-22].

As detailed above, the autopsy report prepared by Dr. Mark Shuman in September 2014 certifies Barrera's cause of death as "cocaine and alpha-Pyrrolidinopentiophenone Toxicity" and lists the "manner of death" as an "accident." The report notes that, after Barrera used cocaine and flakka, "both of which are central nervous system stimulants, [Barrera] became paranoid and aggressive, ran from and was involved in a violent struggle with police, and then suddenly became unresponsive while being evaluated by paramedics" [ECF No. 71-23, p. 5]. The report ruled out "excited delirium syndrome" and determined that "the best explanation for his death is cocaine and alpha-Pyrrolidinopentiophenone toxicity" [ECF No. 71-23, p. 5].

In March 2021, the Chief Medical Examiner (Emma Lew, M.D.) conducted a review of the entire medical record for Barrera's case and concurred with Dr. Shuman that cause of death was "cocaine and alph-pyrrolidinopentiophenone toxicity" [ECF No. 71-24, p. 4]. Dr. Lew noted that, although Barrera had suffered bruises, abrasions, lacerations, and subcutaneous hemorrhages during the struggle with police, such injuries were not lethal and "did not cause hemorrhagic shock and death in this six-foot one-inch, 222 pound man" [ECF No. 71-24, p. 2]. Dr. Lew further noted that "[t]he taser impulses did not cause his death" [ECF No. 71-24, p. 3].

Dr. Gary Vilke, a board-certified emergency department physician with experience in sudden cardiac arrest and sudden cardiac death, likewise reviewed the entire medical and factual record of Barrera's case [ECF No. 71-22]. Dr. Vilke stated that Barrera's behavior leading up to the 911 call was "consistent with an individual who is under the influence of stimulant drugs, including cocaine" [ECF No. 71-22, p. 19]. Dr. Vilke stated, within a reasonable degree of medical certainty, that Barrera's death was not caused by a taser or any injuries sustained during his

altercation with the police officers [ECF No. 71-22, p. 20]. Instead, Vilke summarized Barrera's cause of death as follows:

> Barrera had a heart that was abnormally enlarged to which he added the stimulant drugs cocaine and alpha-PVP, making the heart more volatile and then the extreme exertion and resistance by Mr. Barrera would worsen all physiologic parameters. It was this combination of events that more likely than not, was the cause of Mr. Barrera's sudden cardiac arrest and death.

[ECF No. 71-22, p. 20].

In response to these expert reports, Plaintiff argues that she can nonetheless establish a genuine dispute of material fact as to causation based on the following materials (1) statements from Miami-Dade EMS personnel who arrived on scene after Barrera's arrest but hours before Barrera's death; (2) a statement by Dr. Edward Lineen, Barrera's treating physician, regarding the decision to not revive Barrera if he needed resuscitation; and (3) a report from Dr. Stockham, an expert in forensic toxicology [ECF No. 78, pp. 11-12].

More specifically, as to the EMS personnel, Plaintiff asserts, without citation, that EMS personnel "believe[d] that Maykel had died as a result of electrocution from the taser" [ECF No. 78, p. 12]. This is incorrect. As the EMS Report provided by Defendants indicates, EMS personnel arrived on scene at 11:25 p.m., saw Barrera restrained with electrodes still attached, saw officers struggling to get Barrera in the back of the squad car, and then evaluated Barrera [ECF No. 71-21, p. 1]. EMS personnel found Barrera's vital signs and began to evaluate him, but Barrera went into respiratory arrest, prompting EMS personnel to initiate CPR and transfer him to the hospital at 11:58 p.m. [ECF No. 71-21, p. 1]. Barrera died at 7:55 a.m. the next day [ECF No. 71-23, p. 1]. The EMS report does not state an opinion on cause of death but rather lists the following medical impressions:

**BIZARRE BEHAVIOR** *POSSIBLE*: **PSYCHIATRIC** *CARE REQUIRED*: ALS  **CARDIAC ARREST** *ONSET*: **WHILE EMS ON SCENE** *ARREST WITNESSED*: **YES**  *ARREST AFTER EMS ARRIVAL*: **YES**  *RESUSCITATION ATTEMPTED BY EMS*: **YES**  *WAS AN AED USED*: **NO** *WHO FIRST APPLIED AED OR DEFIB*: **RESPONDING EMS PERSONNEL**  *INITIAL ARREST RHYTHM*: **ASYSTOLE**  *ROSC*: **YES IN FIELD** *SUSTAINED ROSC*: **YES**  *PRESUMED CARDIAC ARREST ETIOLOGY*: **CARDIAC**  *OUT OF HOSPITAL DISPOSITION*: **TRANSPORTED TO HOSPITAL**  *END OF THE EVENT*: **ONGOING RESUSCITATION IN ED**  *DNR*: **NO**

[ECF No. 71-12 p. 2].

Second, Plaintiff points to a statement made by Dr. Edward Lineen, Barrera's treating physician at Jackson Memorial Hospital, regarding the hospital's decision not to resuscitate Barrera [ECF No. 76 ¶ 118; ECF No. 78, p. 11].  Plaintiff characterizes Dr. Lineen's discharge notes as indicating a cause of death, but Dr. Lineen's discharge notes say that "a decision was made to make him DNR [do not resuscitate] as we felt he was nonsurvival with too many severe injuries" [ECF No. 76-1, p. 34].  Dr. Lineen's discharge notes do contain a history of the patient and additional medical notes, including that he suffered cardiac arrest and presented with multiple contusions and an intracranial injury, but they do not state a cause of death or constitute an opinion on cause of death.

Finally, Plaintiff points to the expert report and deposition testimony of Dr. Terri Stockham [ECF No. 78, p. 11].  As set forth above, during her deposition testimony, Dr. Stockham confirmed that Barrera had cocaine in his system [ECF No. 71-24, p. 69:16–21], but also stated that, "I think he died from a beating" [ECF No. 71-27, p. 88:7–20].  When questioned directly whether she was offering an opinion as to Barrera's cause of death, Dr. Stockham clarified that (1) toxicologists like herself "do not offer opinions on cause or manner of death" [ECF No. 71-27, p. 12:1–12]; (2) she did not have expertise in the physiological effect of tasers on the human body [ECF No. 71-27, p. 130:1–2]; (3) she was not offering an opinion on cause of death [ECF No. 71-27, p. 90:10–18]; (4) she was leaving an opinion on cause of death to a pathologist whom she believed Plaintiff had hired to review the case [ECF No. 71-27, p. 10:4–9]; and (5) she accepted as "true and accurate" the lab results from the Miami-Dade Toxicology Lab [ECF No. 71-27, p. 49:14–

18].  It is true that Dr. Stockham did, during her testimony, state that she believed Barrera did not die from a drug overdose alone [ECF No. 71-27, p. 90:10–18], but when asked whether the physical injuries that Barrera suffered were the cause of his death, Dr. Stockham stated that "I think that's beyond my area of expertise," and that she "would defer to the Medical Examiner if he's—you know, they are the ones that do cause of death" [ECF No. 71-27, p. 128:12–20].

Based on the record evidence, and construing all reasonable inferences in favor of Plaintiff, the Court finds that Defendants have affirmatively shown that no genuine issue of material fact exists to support an essential element of Plaintiff's wrongful death claim—that a beating or taser caused Barrera's death. Nor has Plaintiff come forward with evidence to withstand a directed verdict motion at trial. *See generally Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116–17 (11th Cir. 1993).  Plaintiff does not provide any expert witnesses, medical testimony, or doctors' reports establishing the cause of Barrera's death or even that the use of a taser could have caused Barrera's death.  Instead, Plaintiff offers the first "impressions" from responding EMS personnel who did not opine on Barrera's death (which took place seven hours later) [ECF No. 71-21, pp. 2, 5], and a vague reference to a statement made by Dr. Lineen, Barrera's treating physician, that Barrera had suffered bodily injuries warranting no resuscitation [ECF No. 78, p. 11].  Neither of these materials offers an opinion as to the cause of Barrera's death.  Finally, although Dr. Stockham at times appeared to be offering an opinion as to Barrera's cause of death, she confirmed explicitly that she was not offering a contrary opinion to the cause of death [ECF No. 71-27, pp. 90–92 (referring to the anticipated opinion of a pathologist whose opinion Plaintiff has not produced)], and she conceded that such an opinion would exceed her area of expertise [ECF No. 71-27, p. 128:12–20].

All told, none of the materials supplied by Plaintiff creates a genuine issue of material fact that a beating or tasering caused Barrera's death.  The Court is left with the unrebutted opinion of three experts who attest that Barrera died from a drug overdose.  Rule 56 requires the court to resolve factual issues in favor of the non-moving party, but this is a case where Plaintiff has failed to make a sufficient showing to establish the existence of an essential element of her claim, warranting summary judgment as to Count 11 of the Complaint.  *See Celotex*, 477 U.S. at 322; *Timson v. Juv. & Jail Facility Mgmt. Servs., Inc.*, 355 F. App'x 283, 284–85 (11th Cir. 2009) (affirming grant of summary judgment in a wrongful death case because there was a total absence of evidence to support an inference of causation).

## C.  Defendants are entitled to qualified immunity on Plaintiff's excessive force claims

In Counts 2 through 7 of her Complaint,[4] Plaintiff asserts Fourth Amendment excessive-force claims against all of the officer Defendants pursuant to Section 1983 [ECF No. 1-2 ¶¶ 39–73].[5]  Plaintiff argues, without record citations, that "[i]t is undisputed that once Maykel Barrera went to the ground, he never got up on his own, was in a grip that prevented him from going anywhere, and yet was still repeatedly kicked, tased, and beaten by the Officers" [ECF No. 78, p. 10].  Defendants move for summary judgment, claiming qualified immunity [ECF No. 70, pp. 13–20].  After viewing the full summary judgment record in a light most

---

[4] As noted above, Count 1 against Officer Gomez was dismissed by Plaintiff [ECF Nos. 75, 97].

[5] Each of the Defendant Officers applied different levels of force: Ballesteros, Mead, and Maldonado used tasers against Barrera [ECF No. 71 ¶¶ 41-42, 47, 59-60, 70-72]; Rodriguez and Noriega struck him [ECF No. 71 ¶ 68 ("distractionary" strikes in the rib area by Rodriguez); ECF No. 71 ¶ 69 (knee strike by Noriega)]; and Ferrer attempted to taser Barrera inside Barrera's residence initially and restrained Barrera's arms following Barrera's resistance [ECF No. 71 ¶¶ 37 –38, 53–54].  In light of Plaintiff's Statement of Material Facts and Plaintiff's failure to file a Response to Defendants' Statement of Material Facts, this Order examines the use of force as to all Defendants in a combined fashion, construing the degree of force in the light most favorable to Plaintiff.

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

favorable to Plaintiff, the Court concludes that Defendants' use of non-lethal force did not violate Barrera's constitutional rights, and Defendants are entitled to qualified immunity.

"A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, 574 U.S. 13, 16 (2014). "To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Wood v. Kesler*, 323 F.3d 872, 877 (11th Cir. 2003) (internal quotation marks omitted). If the official makes this showing, the burden shifts to the plaintiff to overcome the privilege of qualified immunity. *See Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009). To meet this burden, the plaintiff must prove (1) that the defendant violated a statutory or constitutional right and (2) that this right was "clearly established at the time of the challenged conduct." *Carroll*, 574 U.S. at 16. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Here, there is no dispute that Defendants acted within their discretionary authority when using non-lethal force to subdue Barrera during his arrest [ECF No. 78, p. 9 ("The parties agree that the officers were acting within the scope of their discretionary authority."); *See Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019), *cert. denied*, 141 S. Ct. 233 (2020) ("Defendant Officers readily satisfied this requirement, as they undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions."). The burden therefore shifts to Plaintiff to overcome the qualified-immunity defense. *Id.* She has failed to do so.

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citation omitted). "The standard for whether the use of force was excessive under the Fourth Amendment is one of 'objective reasonableness.'" *Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted). A court looks to the "totality of circumstances" to determine whether the manner of arrest was reasonable. *Draper v. Reynolds*, 369 F.3d 1270, 1277 (11th Cir. 2004) (quotation marks and citation omitted). This analysis must "embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–397. "[T]he qualified immunity standard is broad enough to cover some mistaken judgment, and it shields from liability all but the plainly incompetent or those who knowingly violate the law." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) (alteration added; quotation marks and citation omitted).

Reviewing the facts in the light most favorable to Plaintiff shows the following. Defendant Officers were dispatched in emergency mode regarding a "violent dispute on an open line" [ECF No. 71 ¶ 22; ECF No. 71-11, p. 2:2–6; ECF No. 71-12]. Barrera was on drugs and acting paranoid because it looked like he had used crack [ECF No. 71 ¶7; ECF No. 76 ¶ 4; ECF No. 71-4, p. 2]. Upon officers' arrival at Barrera's apartment (11:04 p.m.), Barrera began to curse at the officers and slammed the door on Officer Ferrer [ECF No. 71 ¶¶ 33–35; ECF No. 76 ¶ 39]. Barrera fled the scene on foot, failing to comply with demands to stop, and started running on the street

for several blocks [ECF No. 76 ¶ 15; ECF No. 71 ¶39].  While on the street, Officer Mead ordered Barrera to stop, deployed her taser on Barrera, but he continued running despite commands to stop, appearing "possessed" and "crazy" [ECF No. 71-13, p. 58:18–25; ECF No. 71 ¶¶ 40–43].  More officers arrived and deployed their tasers on Barrera multiple times but were not able to subdue Barrera [ECF No. 71 ¶¶ 47–48].  Barrera was "enraged," "very combative," and "pushing everyone around, especially Officer Ballesteros" [ECF No. 71 ¶¶ 50–51; ECF No. 71-17, p. 28:16–21 & p. 30:21–25].  Barrera was fighting the officers, "did not want to be arrested," and hit two officers "with his elbows" [ECF No. 71 ¶ 57; ECF No. 71-18, p. 20:23–25].  Barrera "attempt[ed] to choke out [Officer] Ballesteros" while on top of Officer Ballesteros [ECF No. 71 ¶¶ 63–64; ECF No. 71-16, p. 84:13–15 (alteration added)].  Officer Gomez was struck during the struggle and lost consciousness [ECF No. 71 ¶ 63].  When emergency backup officers arrived, they saw a police officer lying motionless on the ground bleeding from his head [ECF No. 71 ¶ 63].  Officer Rodriguez struck Barrera with two "distractionary" strikes in his rib area, and Officer Noriega struck Barrera once on his right shoulder [ECF No. 71 ¶ 69; ECF No. 76 ¶ 53; ECF No. 71-20, p. 23:3–23].  Officer Ballesteros gripped one of Barrera's arms while the other officers restrained Barrera, and Barrera told Officer Ballesteros that he was breaking his arm [ECF No. 76 ¶ 57; ECF No. 71-10, p. 167:2–4].  Officer Maldonado deployed his taser twice on Barrera's upper torso and once on Barrera's shoulder, and only then were the officers finally able to handcuff Barrera [ECF No. 71 ¶¶ 70–72; ECF No. 76 ¶ 52].  When the EMS paramedics arrived, they observed police "struggling to get [Barrera] in [the] back of their squad car" [ECF No. 71 ¶ 78].  The struggle between Barrera and the officers lasted fourteen minutes, and it took at least five officers to subdue and restrain Barrera [ECF No. 71 ¶¶ 23, 76, 80].

The two lay witnesses to the incident, Gwendolyn Flowers and Demetrious McKenzie, confirmed that Barrera was fleeing the officers and resisting arrest.  McKenzie stated that Barrera "was like fighting so he won't get the cuffs on him" [ECF No. 71-18, p. 15:2–6], that Barrera struck at least two officers with his elbows, and that even five to six officers combined "could not get him down" [ECF No. 71-18, pp. 15:4–23, 21:1–5, 61:21–22].  Although McKenzie describes Barrera as "calm" for a limited period once he was on the ground [ECF No. 71-18, p. 26:16–17], she stated that "the [o]nly way they got him on the ground [was] when they [were] Tasing him" [ECF No. 71-18, p. 18:1–9 (alterations added)].  McKenzie confirmed that it was only after the officers deployed their tasers that they "handcuffed [Barrera] after they seen he wasn't moving no more.  That's when they put the handcuffs on him" [ECF No. 71-18, pp. 15:2–6; 18:10–18].

Flowers stated that she saw Barrera running away from the officers, and that after the officers used their Tasers on Barrera, she witnessed the officers "kick" Barrera [ECF No. 71-25, p. 48:1–3].  Flowers was unsure how many times Barrera was kicked, by how many people, or for what length of time [ECF No. 71-25, p. 51:2–5].  Flowers was not sure whether the officers used their tasers on Barrera once he was on the ground, stating, "I don't know.  I can't answer that. I don't know" [ECF No. 71-25, p. 54:1–5].

Under the totality of the circumstances, the Court finds that the Defendants acted reasonably, as an objective matter, both in tasing and using physical force to subdue and arrest Barrera.  The Eleventh Circuit has "held a number of times that severe force applied *after* the suspect is safely in custody is excessive."  *Mobley v. Palm Beach Ct. Sheriff Dep't*, 783 F.3d 1347, 1356 (11th Cir. 2015) (emphasis in original).  But "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive."  *Id.* The "dividing point between excessive and non-

excessive force" is not limited to the point when a suspect falls to the ground but whether the suspect is "completely restrained or otherwise resisting arrest." *Callwood v. Jones*, 727 F. App'x 552, 559 (11th Cir. 2018).

In the context of tasers more specifically, "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Prosper v. Martin*, 989 F.3d 1242, 1254 (11th Cir. 2021) (internal quotation marks omitted), *cert. denied*, No. 21-492, 2021 WL 5043641 (U.S. Nov. 1, 2021).  Some cases are instructive.

In *Mobley*, for example, the Eleventh Circuit held that the repeated use of tasers against a suspect who was lying on the ground did not constitute excessive force.  783 F.3d at 1356.   The suspect in *Mobley* hit a police officer with his truck after being investigated for smoking crack cocaine, led police officers on a high-speed chase, and upon capture refused to surrender his hands to be handcuffed.  *Id*. at 1350–51.  The officers "pinned" the suspect on the ground, ordered him to surrender his hands to be cuffed, then "struck and kicked" the suspect in the face while repeatedly tasing him until he placed his hand behind his back.  *Id*. at 1351.  In affirming the district court's grant of qualified immunity to the officers, the Eleventh Circuit stated that the plaintiff could not "point to any circumstances before he quit resisting and was handcuffed that show the force applied against him was objectively unreasonable."  *Id*. at 1356.

More recently in *Prosper*, the Eleventh Circuit held that the use of a taser was not excessive force when a suspect and an officer "exchanged blows," and the suspect ignored commands to get on the ground.  989 F.3d at 1254.

And in *Draper*, the Eleventh Circuit affirmed the grant of summary judgment in favor of an officer where the officer used a taser gun to effectuate an arrest of a suspect who was belligerent and refused to comply with commands but did not physically resist.  369 F.3d at 1278.

As for kicking, the Eleventh Circuit has held that the use of force, including "kicking" a suspect, is not excessive when the suspect is not fully secured and continues to "flail around as the officers attempt[] to handcuff him."  *See Marantes v. Miami-Dade Cty.*, 776 F. App'x 654, 665 (11th Cir. 2019) (holding that administering several "distractionary kicks" to a suspect who was flailing around as officers tried to handcuff him was not objectively unreasonable under the Fourth Amendment); *see also Mobley*, 783 F.3d at 1351 (officers' use of force in striking, kicking, and tasing suspect was not excessive where the suspect, though pinned on the ground, was "refusing to surrender his hands to be cuffed").

Applying these principles here, the Court concludes that the Officers did not violate Barrera's Fourth Amendment right to be free from excessive force.  Even according to the bystander testimony offered by Barrera, Barrera's struggle with the officers was violent, aggressive, and prolonged [ECF No. 71-18, pp. 14–19].  Barrera led the officers on a chase in the streets, repeatedly refused to obey orders to comply, physically struck two officers (resulting in one officer (Officer Gomez) lying motionless on the ground bleeding), fought to refuse handcuffs, acted belligerently, and never fully stopped resisting until he was placed in handcuffs.  Demetrius McKenzie did, at one point in her testimony, describe Barrera as "calm" on the ground before the officers used their tasers again [ECF No. 71-18, p. 26:16–17].  But McKenzie testified that the Officers were able to handcuff Barrera only after he stopped resisting, stating that it was the tasers that permitted the officers to get Barrera on the ground [ECF No. 71-18, p. 18].  Moreover, it is undisputed that Barrera never was fully restrained during the fourteen-minute encounter when

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

officers arrived to his apartment until the officers were able to place him in handcuffs on the street, and there is no evidence that Barrera was tasered while handcuffed.  *See Mobley*, 783 F.3d at 1356 ("Our decisions demonstrate that the point at which a suspect is handcuffed and 'pose[s] no risk of danger to the officer' often is the pivotal point for excessive-force claims.") (quoting *Galvez v. Bruce*, 552 F.3d 1238, 1243 (11th Cir. 2008)).  In a "difficult, tense and uncertain situation," as clearly was the case here, *Graham*, 490 U.S. at 397, the use of a taser to subdue a belligerent and non-compliant suspect does not rise to the level of excessive force under the Fourth Amendment.

Plaintiff offers no contrary caselaw to rebut the quality immunity defense [ECF No. 78]. Plaintiff points principally to *Cantu v. City of Dothan, Alabama*, 974 F.3d 1217, 1230 (11th Cir. 2020) [ECF No. 78, pp. 8–10], but in that case, the Eleventh Circuit held that a police officer's use of deadly force (shooting a suspect with her firearm) was unreasonable when the suspect "never threw any punches, never kicked any of the officers, never hit any of them, never tried to get one of their firearms, and never physically or verbally threatened to harm them."  *Id*.  That is not the case here.  Plaintiff also cites *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009), but *Oliver* involved a compliant and cooperative suspect who did not demonstrate a threat to the officers.  *Id.* at 906–07.

In sum, Plaintiff has failed to carry her burden to show a Fourth Amendment violation, rendering unnecessary a discussion of the second prong of the qualified immunity analysis.[6] Summary judgment in favor of Defendants is warranted on Counts 2 and 7.

---

[6] Although the Court need not address whether the Officers' actions violated clearly established law, Plaintiff has not offered any precedent in place as of February 2014 warranting the conclusion that it would have been plain to the officers that their conduct was unlawful in the situation they confronted.  *See Bussey-Morice v. Gomez*, 587 F. App'x 621, 624, 629–30 (11th Cir. 2014) (finding no violation of clearly established Fourth Amendment law where officers repeatedly tasered a belligerent suspect who had "unbelievable strength," refused to comply with multiple orders, faced officers in a "threatening stance," and never ceased his resistance to the officers'

CASE NO. 16-23241-CIV-CANNON/Otazo-Reyes

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion for Summary Judgment [ECF No. 70] is **GRANTED**

2. The Court will enter Final Judgment pursuant to Federal Rule of Civil Procedure 58 by

separate order.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida this 22nd day of November

2021.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

---

attempts to restrain him); *Hoyt v. Cooks*, 672 F.3d 972, 975, 980 (11th Cir. 2012) (finding no violation of clearly established Fourth Amendment law where officers used taser on suspect who was on the ground and refusing to let officers handcuff him).